No. 15-1093

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————————

UNITED STATES OF AMERICA, *EX REL.* JON H. OBERG,

*Plaintiff-Appellant*,

v.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY;
VERMONT STUDENT ASSISTANCE CORPORATION,

*Defendants-Appellees*.

————————————

On Appeal from the United States District Court
for the Eastern District of Virginia
(No. 1:07-cv-00960-CMH-JFA)

————————————

## BRIEF FOR APPELLEES PENNSYLVANIA
## HIGHER EDUCATION ASSISTANCE AGENCY AND
## VERMONT STUDENT ASSISTANCE CORPORATION

————————————

JOHN S. WEST
MEGAN C. RAHMAN
TROUTMAN SANDERS LLP
1001 Haxall Point
PO Box 1122
Richmond, VA 23218
(804) 697-1269
john.west@troutmansanders.com

CHRISTOPHER G. BROWNING, JR.
TROUTMAN SANDERS LLP
P.O. Drawer 1389
Raleigh, NC 27602

*Counsel for Appellee Vermont Student
Assistance Corporation*

PAUL D. CLEMENT
GEORGE W. HICKS, JR.
RAYMOND P. TOLENTINO
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellee Pennsylvania
Higher Education Assistance
Agency*

March 23, 2015                    (Additional Counsel Listed on Inside Cover)

JOSEPH P. ESPOSITO
JILL M. DEGRAFFENREID
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037
(202) 955-1500

DANIEL B. HUYETT
NEIL C. SCHUR
STEVENS & LEE P.C.
111 North 6th Street
Reading, PA 19603
(610) 478-2219

*Counsel for Appellee Pennsylvania Higher Education Assistance Agency*

## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee Pennsylvania Higher Education Assistance Agency is an arm of the Commonwealth of Pennsylvania. It is not a publicly held entity, it has no parent entity, no publicly held entity owns any portion of it, and no publicly held entity has a direct financial interest in the outcome of this litigation.

Defendant-Appellee Vermont Student Assistance Corporation is a Vermont state agency and instrumentality of the State of Vermont. Vt. Stat. Ann. tit. 16, §2823(a), (c); Vt. Stat. Ann. tit. 32, §5932(1). The State of Vermont holds all ownership of VSAC and its assets. Vt. Stat. Ann. tit. 16, §2821(b). VSAC is not a publicly held entity and has no parent corporation. No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation with respect to VSAC.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................... i

TABLE OF AUTHORITIES.................................................... iv

INTRODUCTION ........................................................... 1

STATEMENT OF THE ISSUE................................................ 2

COUNTERSTATEMENT OF THE CASE AND FACTS ...................... 2

    A.   Oberg's Lawsuit.................................................... 2

    B.   PHEAA ............................................................ 3

    C.   VSAC .............................................................. 6

    D.   Decision Below .................................................... 8

SUMMARY OF ARGUMENT.............................................. 10

ARGUMENT .............................................................. 16

I.    PHEAA Is An Arm Of The Commonwealth. ............................ 17

    A.   Pennsylvania Would Be Liable for a Judgment Against PHEAA. .................................................... 17

    B.   Pennsylvania Exercises Pervasive Control over PHEAA............................................................ 27

    C.   PHEAA's Operations Advance the Compelling Statewide Concern of Improving the Higher Education Opportunities of Pennsylvania Citizens.............................. 35

    D.   Pennsylvania Treats PHEAA as a Commonwealth Agency......................................................... 40

II.   VSAC Is An Arm Of The State. .................................... 45

    A.   Because Vermont Is Functionally Liable for Judgments Against VSAC (Other than Certain Specified Loan Obligations), the First Factor Favors VSAC. ........................................................... 46

B.    Because the Activities of VSAC Are Tightly
      Controlled by Vermont, the Second Factor Favors
      VSAC. ....................................................................................... 51

C.    Because VSAC Is Primarily Involved with State
      Concerns, the Third Factor Favors VSAC. ........................................ 56

D.    Vermont Treats VSAC as a State Agency and
      Instrumentality of Vermont, Thereby Resulting in the
      Fourth Factor Favoring VSAC. ........................................................ 57

CONCLUSION .................................................................................... 59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006)..........................................................................43

*Bowers v. NCAA*,
475 F.3d 524 (3d Cir. 2007) ...........................................................40

*Brennan v. Univ. of Kan.*,
451 F.2d 1287 (10th Cir. 1971) .......................................................28

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
948 F. Supp. 400 (D.N.J. 1996) .......................................................27

*Dash v. Mayweather*,
731 F.3d 303 (4th Cir. 2013) ...........................................................16

*Daye v. State*,
769 A.2d 630 (Vt. 2000) ........................................................... 13, 47

*Ernst v. Rising*,
427 F.3d 351 (6th Cir. 2005)............................................................25

*Febres v. Camden Bd. of Educ.*,
445 F.3d 227 (3d Cir. 2006) ............................................................18

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*,
535 U.S. 743 (2002).........................................................................58

*Garcia v. San Antonio Metro. Transit Auth.*,
469 U.S. 528 (1985).........................................................................38

*Hess v. Port Auth. Trans-Hudson Corp.*,
513 U.S. 30 (1994).............................................. 25, 28, 46, 50

*Hutto v. S.C. Ret. Sys.*,
773 F.3d 536 (4th Cir. 2014)................................................. *passim*

*In re Post*,
17 A.2d 326 (Vt. 1941) ....................................................................48

iv

*Lang v. PHEAA,*
No. 1:12-cv-1247 (M.D. Pa. Jan. 18, 2013) ................................................... 5, 41

*Md. Stadium Auth. v. Ellerbe Becket Inc.,*
407 F.3d 255 (4th Cir. 2005) ...................................................................... *passim*

*Michigan v. United States,*
40 F.3d 817 (6th Cir. 1994) ....................................................................................24

*Nixon v. Belmont-Harrison Juvenile Dist., Sargus Juvenile Ctr.,*
113 F. App'x 51 (6th Cir. 2004) ............................................................................16

*Payne v. Rozendaal,*
520 A.2d 586 (Vt. 1986) .........................................................................................48

*PHEAA v. Barksdale,*
449 A.2d 688 (Pa. Super. Ct. 1982) ......................................................................41

*PHEAA v. Reid,*
15 Pa. D & C.3d 661 (Pa. Ct. Com. Pl. 1980) .....................................................41

*Pub. Sch. Ret. Sys. of Mo. v. State St. Bank & Trust Co.,*
640 F.3d 821 (8th Cir. 2011) .................................................................................25

*Regents of Univ. of Cal. v. Doe,*
519 U.S. 425 (1997) ...............................................................................................25

*Richmond v. PHEAA,*
297 A.2d 544 (Pa. Commw. Ct. 1972) .................................................................41

*Ristow v. S.C. Ports Auth.,*
58 F.3d 1051 (4th Cir. 1995) ........................................................................... 21, 46

*S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.,*
535 F.3d 300 (4th Cir. 2008) ........................................................... 24, 28, 43, 46

*Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.,*
208 F.3d 1308 (11th Cir. 2000) .............................................................................30

*Steadfast Ins. Co. v. Agric. Ins. Co.,*
507 F.3d 1250 (10th Cir. 2007) .............................................................................37

*Tucker v. Williams*,
682 F.3d 654 (7th Cir. 2012) ............................................................50

*United States ex rel. King v. Univ. of Tex. Health Sci. Ctr.-Houston*,
544 F. App'x 490 (5th Cir. 2013) ............................................... 22, 33

*United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*,
739 F.3d 598 (11th Cir. 2014) ..................................... 16, 22, 25, 46

*United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*,
681 F.3d 575 (4th Cir. 2012) .............................................................. 2, 16

*United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
745 F.3d 131 (4th Cir. 2014) ..................................................... *passim*

*United States v. Richardson*,
418 U.S. 166 (1974) ..........................................................................53

*Venkataram v. Office of Info. Policy*,
590 F. App'x 138 (3d Cir. 2014) ......................................................16

**Constitutional Provisions**

Pa. Const. art. IV, §1 ........................................................................42

Pa. Const. art. VI, §7 ................................................................... 4, 28

**Statutes**

20 U.S.C. §1085 ................................................................................37

24 P.S. §5101 .....................................................................................3

24 P.S. §5102 ............................................................................... 3, 28

24 P.S. §5104 ........................................................................... *passim*

24 P.S. §5104.3 ..................................................................................5

24 P.S. §5105.1 .......................................................................... 19, 20

24 P.S. §5105.6 ............................................................... 3, 18, 28, 40

24 P.S. §5107 ....................................................................................18

24 P.S. §5108 ................................................................................20

24 P.S. §5109 ................................................................................18

24 P.S. §5112 ................................................................................40

24 P.S. §5151 ..................................................................................3

24 P.S. §5152 ..................................................................................3

65 P.S. §1102 ..................................................................................5

65 P.S. §67.102 .............................................................................34

65 P.S. §703 ..................................................................................34

71 P.S. §111.2 ...............................................................................28

71 P.S. §732-102 ...........................................................................42

71 P.S. §732-204 ............................................................... 33, 34, 42

71 P.S. §776.5 ...............................................................................40

71 P.S. §776.6 ...............................................................................40

71 P.S. §776.7 ...............................................................................40

71 P.S. §776.8 ...............................................................................40

72 P.S. §1501 ................................................................................18

72 P.S. §1502 ................................................................................18

72 P.S. §301.1 ...............................................................................17

72 P.S. §306 ..................................................................................18

72 P.S. §307 ..................................................................................18

Vt. Stat. Ann. tit. 1, §310 .............................................................58

Vt. Stat. Ann. tit. 1, §311 .............................................................58

Vt. Stat. Ann. tit. 1, §312 .............................................................58

Vt. Stat. Ann. tit. 1, §313 ................................................................58

Vt. Stat. Ann. tit. 1, §314 ................................................................58

Vt. Stat. Ann. tit. 1, §315 ................................................................58

Vt. Stat. Ann. tit. 1, §316 ................................................................58

Vt. Stat. Ann. tit. 1, §317 ................................................................58

Vt. Stat. Ann. tit. 1, §317a ..............................................................58

Vt. Stat. Ann. tit. 1, §318 ................................................................58

Vt. Stat. Ann. tit. 1, §319 ................................................................58

Vt. Stat. Ann. tit. 1, §320 ................................................................58

Vt. Stat. Ann. tit. 10, §541a ............................................................54

Vt. Stat. Ann. tit. 16, §2821 ................................................... *passim*

Vt. Stat. Ann. tit. 16, §2823 ................................................... *passim*

Vt. Stat. Ann. tit. 16, §2825 .................................................. 6, 57, 58

Vt. Stat. Ann. tit. 16, §2831 ....................................................... 7, 52

Vt. Stat. Ann. tit. 16, §2832 ...............................................................7

Vt. Stat. Ann. tit. 16, §2835 ....................................................... 8, 53

Vt. Stat. Ann. tit. 16, §2905 ............................................................54

Vt. Stat. Ann. tit. 3, §154 ................................................................55

Vt. Stat. Ann. tit. 3, §258 ................................................................52

Vt. Stat. Ann. tit. 32, §5932 .................................................. 6, 15, 57

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................16

Vt. R. App. P. 14...............................................................................51

**Other Authorities**

Black's Law Dictionary (4th rev. ed. 1968) ........................................ 13, 47

Technical Bulletin TB-33, 2006 Vt. Tax LEXIS 6 (Nov. 28, 2006) ........................57

Technical Bulletin TB-66, 2012 Vt. Tax LEXIS 4 (Sept. 5, 2012) ........................57

Webster's Seventh New Collegiate Dictionary (7th ed. 1967) ...............................47

Webster's Third New International Dictionary (1966) ..................................... 13, 47

## INTRODUCTION

Defendants-Appellees Pennsylvania Higher Education Assistance Agency (PHEAA) and Vermont Student Assistance Corporation (VSAC) occupy central roles in the sovereign affairs of their respective States. Both were created as governmental instrumentalities to perform the essential governmental function of financing higher education opportunities. Both are subject to strict financial constraints and intertwined with their respective state treasuries such that judgments against them are functionally judgments against the States. Both have little meaningful fiscal, legal, and operational autonomy. Both focus primarily, if not exclusively, on sovereign functions of statewide concern. And both are treated as state agencies under state law. Taken together, these attributes overwhelmingly support the District Court's holding that PHEAA and VSAC are arms of their respective States.

That result is fully supported by the summary judgment record that this Court remanded for the District Court to create. *See United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131 (4th Cir. 2014) (*Oberg II*). The undisputed facts established during discovery confirm what the States and numerous state and federal courts have appreciated all along: PHEAA and VSAC are sovereign entities discharging sovereign functions and are fully entitled to sovereign immunity. This Court should affirm.

## STATEMENT OF THE ISSUE

Whether PHEAA and VSAC are arms of their States and therefore not "persons" amenable to suit under the False Claims Act.

## COUNTERSTATEMENT OF THE CASE AND FACTS

### A.    Oberg's Lawsuit

Relator Jon H. Oberg brought this *qui tam* action under the False Claims Act (FCA) alleging that PHEAA and VSAC submitted fraudulent claims to the U.S. Department of Education.[1]  JA 134-39.  After unsealing the complaint, the District Court dismissed Oberg's claims, concluding that PHEAA and VSAC are state agencies and thus not "persons" subject to FCA liability.  JA 89-97.  This Court vacated and instructed the District Court to apply the Fourth Circuit's four-factor "arm of the state" framework to determine whether the state-created entities are persons under the FCA.  *United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575 (4th Cir. 2012) (*Oberg I*).  Applying that test to Oberg's complaint, the District Court again dismissed Oberg's claims after concluding that PHEAA and VSAC are each "arm[s] of … their respective states."  JA 143-65.

On appeal, and before discovery, this Court held that, "at this early stage" of the litigation, Oberg "alleged sufficient facts" that PHEAA and VSAC are not arms of the State.  *Oberg II*, 745 F.3d at 140, 142.  The Court therefore vacated the

---

[1] Oberg also sued several other defendants who are no longer parties.

2

District Court's dismissal as to PHEAA and VSAC and remanded "to permit limited discovery on the question" whether they are "truly subject to sufficient state control to render" them arms of their respective States. *Id.* at 140-42 (quotation marks omitted).

### B.    PHEAA

Since its creation in 1963, PHEAA has occupied an inherently sovereign role as a "government instrumentality" of the Commonwealth. JA 665; 24 P.S. §5101. The Pennsylvania legislature established PHEAA to perform the "essential governmental function" of helping Pennsylvanians to finance their higher educations. JA 245-46, 620-21; 24 P.S. §§5102, 5105.6. PHEAA administers Pennsylvania's State Grant Program and numerous other financial aid programs that directly benefit the Commonwealth and its citizens. JA 246, 326-32, 624-36; 24 P.S. §§5151–52. Between fiscal years 2001-02 and 2006-07 (the relevant time period for this case), PHEAA administered approximately $2.7 billion in financial aid and grant funds to assist Pennsylvanians with their higher education needs. JA 234-36, 327-32, 636.

The Pennsylvania legislature has also empowered PHEAA to issue, purchase, service, and guarantee student loans. JA 333; 24 P.S. §5104 *et seq.* Between 2001-02 and 2006-07, PHEAA issued nearly $8.5 billion in loans to Pennsylvania students, serviced loans for students outside of Pennsylvania, and, at

3

the federal government's request, guaranteed loans for Delaware, West Virginia, and Georgia. JA 326-27, 333, 2431. From those activities, PHEAA generated hundreds of millions of dollars that it contributed to Pennsylvania's financial aid programs. JA 328-32. Then, as now, all of PHEAA's activities and operations directly benefitted the Commonwealth and advanced PHEAA's statutory mission to improve Pennsylvanians' higher education. JA 2434-35, 2460, 2536, 2749, 2986-87, 2991. In short, PHEAA exercises its statutory powers "entirely and exclusively to support Pennsylvania students." JA 246, 2392.

The Commonwealth owns and controls all revenues generated by PHEAA. JA 339-42, 2431-32, 2447. PHEAA must deposit those revenues into the State Treasury, where they are commingled with the Commonwealth's general funds for investment by the State Treasurer and cannot be spent without State Treasurer approval. JA 339-42, 671-76, 2474. Upon dissolution, PHEAA's property belongs to the Commonwealth. JA 237, 249. The Commonwealth also exercises pervasive control over PHEAA's ability to manage its operational and legal affairs. All twenty members of PHEAA's Board of Directors—sixteen state legislators and four gubernatorial appointees—are appointed by Commonwealth officials and can be removed by those officials without cause; additionally, the four non-legislator appointees must be confirmed by the Senate. JA 248, 621; Pa. Const. art. VI, §7. PHEAA cannot spend money without Treasury approval, it cannot borrow money

without the Governor's permission, and the legislature has placed a ceiling on the amount of debt it may incur. JA 242, 334, 339-40, 2469, 2996. PHEAA must report its year-end condition to the Governor and the legislature, and the Commonwealth's Auditor General may audit (and has audited) PHEAA's activities. JA 246-47, 249. The Attorney General of Pennsylvania must review and approve all material deeds, leases, and contracts before they are executed by PHEAA, JA 712-15, 2837-38, 2857, and must represent PHEAA in litigation unless she delegates authority to PHEAA, JA 764-81, 2854-56.

PHEAA is treated as a Commonwealth agency under Pennsylvania law, as Pennsylvania state courts have uniformly held. And like other Commonwealth agencies, PHEAA is exempt from state taxation and state statutes of limitation, JA 2470-71, 2838, 2858; 24 P.S. §5104.3(j), and entitled to sovereign immunity under state law, *see Lang v. PHEAA*, No. 1:12-cv-1247, slip op. at 7-11 (M.D. Pa. Jan. 18, 2013). PHEAA's managers are "public officials" subject to state ethics laws, JA 621, 715; 65 P.S. §1102; its employees are treated as Commonwealth employees for retirement and healthcare purposes, JA 343; and 99% of its employees worked in Pennsylvania during the relevant period, JA 343-44. PHEAA's employees are paid from the State Treasury, JA 343, 673, and their employee badges state: "Commonwealth of Pennsylvania State Employee," JA 342-43, 582.

## C.    VSAC

VSAC was created in 1965 as a public nonprofit corporation "to provide opportunities for persons who are residents of Vermont to attend colleges," as well as "to provide career, educational, and financial aid counseling and information services."  Vt. Stat. Ann. tit. 16, §2821(a).  In creating VSAC, the Vermont legislature declared that VSAC "shall be an instrumentality of the State."  Vt. Stat. Ann. tit. 16, §2823(a).  The Vermont legislature created VSAC to be a "unit of State government" and "state agency."  Vt. Stat. Ann. tit. 32, §5932(1); Vt. Stat. Ann. tit. 16, §2823(c).  As with other state agencies in Vermont, all real and personal property of VSAC is exempt from taxation, and all bonds issued by VSAC are exempt from state income taxation.  Vt. Stat. Ann. tit. 16, §2825.

The Vermont legislature has expressly stated that the State "shall support and maintain" VSAC.  Vt. Stat. Ann. tit. 16, §2823(a).  Although Vermont has disavowed responsibility for the debts and obligations of VSAC in one specified area, it has not disavowed its obligation to "support and maintain" VSAC with respect to all other indebtedness of VSAC.  Vt. Stat. Ann. tit. 16, §2823(f) (certain specified notes and bonds issued by VSAC "shall not be deemed to constitute a debt or liability or obligation of the State of Vermont").

VSAC receives an appropriation of $17 to $20 million annually from the State of Vermont.  Those appropriations, as well as any funds generated by VSAC,

are treated and viewed by Vermont as the property of the State of Vermont.  JA 179-80, 193-95, 199.   All net earnings of VSAC, beyond that necessary to retire VSAC's notes, bonds, and other obligations, inure to the sole benefit of the State of Vermont.  Vt. Stat. Ann. tit. 16, §2821(b).  As a result, the assets of VSAC are included within Vermont's Comprehensive Annual Financial Report.  JA 184-85, 211-12, 1484.  If VSAC were to experience financial distress, it would have a significant impact on the State of Vermont.  JA 181, 194, 195-96.

The management and administration of VSAC vest in its Board of Directors. JA 177-78, 198-99.  Of VSAC's eleven board members, five are appointed by the Governor and three are elected state officials (the State Treasurer, one State senator and one member of the Vermont House of Representatives).  Vt. Stat. Ann. tit. 16, §2831.  Three additional members are elected by the Board.  *Id.*  The Governor selects the Chairperson of VSAC's Board of Directors.  *Id.* §2832(a).

By statute, the Governor has been given control over VSAC's debt structure. Vt. Stat. Ann. tit. 16, §2823(f) ("No debt obligation [of VSAC] may be effective without the approval in writing of the Governor."); *id.* §2823(d) ("No resolution or other action of the Corporation providing for the issuance of such debt obligations may be effective without the approval in writing of the Governor.").  VSAC must appear before the Vermont legislature to obtain its annual appropriation and must provide various periodic reports to the legislative and executive branches.  JA 179-

80, 194-95, 199.  VSAC must also submit an annual audit to the Vermont Secretary of Administration.  Vt. Stat. Ann. tit. 16, §2835.

The Governor and Vermont legislature have directed VSAC to provide various services and administer certain programs without providing appropriations to separately fund those services.  JA 182, 211.  Moreover, the Vermont legislature has provided that the State has the right to direct the activities and structure of VSAC and may re-appropriate all assets of the State being held by VSAC.  Vt. Stat. Ann. tit. 16, §2821(b) ("The State reserves the right at any time to alter, amend, repeal, or otherwise change the structure, organization, programs, or activities of the Corporation, including the power to terminate the Corporation, subject to any limitation on the impairment of the obligations of any contract or contracts entered into by the corporation.").  The legislature has also directed that VSAC shall be subject to the State's Open Meetings Law and Public Records Law.

**D.    Decision Below**

The District Court granted summary judgment to PHEAA and VSAC, concluding that both were arms of the State based on the undisputed factual record established during discovery.  JA 3663-77.

As to PHEAA, the District Court first held that a "judgment against PHEAA would create functional liability for the Commonwealth" and would clearly "implicate the Pennsylvania Treasury."  JA 3667.  The District Court observed that

8

"further factual development" showed that the Commonwealth retained "significant control over PHEAA's assets and generated revenue" and treated "PHEAA's finances as State money." *Id.* Second, the District Court concluded that, following discovery, "Pennsylvania's control over PHEAA appears to be quite clear," and emphasized numerous Commonwealth constraints on PHEAA's autonomy, from the composition of PHEAA's board to the "several forms of veto power" over its financial and legal affairs. JA 3669-70. Third, the District Court determined that "PHEAA engages in statewide activities," all of which focus on advancing a quintessential state concern: "making higher education affordable for Pennsylvanians and Pennsylvania students." JA 3672. PHEAA's national loan operations did nothing to alter this conclusion because they were performed "to generate earnings to return to Pennsylvania students and defray their costs." JA 3672-73. Fourth, the District Court pointed to many facts establishing PHEAA's status as a Commonwealth agency under state law, including its tax-exempt status, its uniform treatment as a Commonwealth agency by Pennsylvania courts, and its obligations under Pennsylvania transparency laws. JA 3674-75.

As to VSAC, the District Court first concluded that "a judgment against VSAC would create functional liability for the State of Vermont" because VSAC lacks "financial independence from the State," and its "assets are essentially State assets." JA 3668. The District Court explained that "any judgment paid directly

9

by VSAC reduces the funding available to pursue its statutory purpose." *Id.*
Second, the District Court held that Vermont exercised pervasive control over
VSAC by, among other things, controlling the composition and removal of the
agency's board members and subjecting VSAC to onerous financial reporting
requirements. JA 3670-71. Third, the District Court held that VSAC was involved
with state concerns in light of its statutory mission of ensuring educational
opportunities for Vermont students and its innumerable services furthering that
mission. JA 3673. Finally, the District Court concluded that Vermont treats VSAC
like a state agency by exempting it from state taxes, designating it as "an
instrumentality of the state," and subjecting it to numerous obligations under
Vermont's Open Meeting Law and Public Records Law. JA 3675.

## SUMMARY OF ARGUMENT

The extensive evidentiary record developed during discovery conclusively
establishes that PHEAA and VSAC are arms of their respective States and thus not
"persons" under the FCA. Oberg's arguments to the contrary rely on
misstatements of the law and mischaracterizations of the record.

As to PHEAA, *first*, the record confirms that the Commonwealth of
Pennsylvania would be at least functionally liable for a judgment against PHEAA.
PHEAA's revenues are deposited into the State Treasury, commingled with the
Commonwealth's general funds, and invested by the State Treasurer as the

10

Commonwealth sees fit. To spend any of its revenues, PHEAA must obtain the State Treasurer's approval. The Commonwealth has said that PHEAA is "fiscally dependent" and includes PHEAA's financial information in its annual financial reports. PHEAA-generated revenues are considered the Commonwealth's assets and are the Commonwealth's property upon PHEAA's dissolution. For these reasons, the Chair of PHEAA's board and Chair of the Commonwealth's House Appropriations Committee has testified without contradiction that any judgment against PHEAA would be paid with the Commonwealth's money from the State Treasury and would directly implicate the public fisc. That firmly establishes functional liability. PHEAA's recent financial success does not alter the analysis; PHEAA was created as an arm of the Commonwealth and has remained one through changing economic times and regulatory climates.

*Second*, the undisputed facts demonstrate that Pennsylvania exercises pervasive control over PHEAA. Every one of PHEAA's twenty board members— sixteen of whom are sitting legislators, and the other of whom must be confirmed by the Senate—is appointed and removable by the Commonwealth, giving the Commonwealth total control of PHEAA. The Commonwealth may alter PHEAA's powers at any time, and the evidentiary record establishes that the Commonwealth significantly constrains PHEAA's financial and legal affairs. As a prototypical

11

Commonwealth agency, PHEAA lacks true autonomy from the Commonwealth in every relevant respect.

*Third*, the evidentiary record confirms that *all* of PHEAA's activities—including those reaching outside of Pennsylvania—advance the quintessential state concern of improving higher education opportunities for Pennsylvania residents. PHEAA administers billions of dollars in financial assistance programs for the benefit of Pennsylvanians. In furtherance of its central mission to improve the educational opportunities of Pennsylvanians, PHEAA also generates funds through loan-related services for non-residents, allowing it to contribute hundreds of millions of dollars in additional higher education funds for Pennsylvanians. PHEAA's ability to discharge a sovereign function so efficiently that it provides services to other States and out-of-state residents is no basis for divesting PHEAA of its immunity. Arm-of-the-state immunity is not limited to state entities that operate inefficiently. What is relevant is that all of PHEAA's operations—undertaken almost entirely by Pennsylvanians—redound to the exclusive benefit of Pennsylvanians in furtherance of a quintessential state concern.

*Fourth*, applicable Pennsylvania statutes, regulations, and court decisions, as well as the undisputed factual record, overwhelmingly establish that PHEAA is a Commonwealth agency under Pennsylvania law. So too is it an arm of the Commonwealth under federal law and thus not a "person" under the FCA.

As to VSAC, each of the four factors weighs in favor of VSAC.  *First*, the State of Vermont is liable for judgments against VSAC (other than certain specified loan obligations).  By statute, Vermont has provided that it will "support and maintain" VSAC.  Vt. Stat. Ann. tit. 16, §2823(a).  The Vermont Supreme Court has recognized that such language imposes on the State a "fundamental obligation" to undertake what it has said it will do.  *Daye v. State*, 769 A.2d 630, 633-34 (Vt. 2000).  This directive by the Vermont Supreme Court is consistent with the standard dictionary definition of the words "support" and "maintain"—whose definitions include to "bear the expense of" and "furnish[] funds or means for maintenance."  *See* Black's Law Dictionary 1105, 1609 (4th rev. ed. 1968); *see also* Webster's Third New International Dictionary 1362 (1966).  Moreover, the Vermont legislature has expressly disavowed the State's liability for judgments against VSAC in certain specific, narrow circumstances (i.e., notes and bonds). The doctrine of *inclusio unius est exclusio alterius*, which has been repeatedly employed by the Vermont Supreme Court, dictates that by specifically listing bonds and notes as indebtedness that would not fall on the State, the legislature intended for all other indebtedness of VSAC to be obligations of the State.  To the extent that there is any doubt in the Court's mind on the construction of Vermont law, the appropriate course would be for this Court to certify this question of state

law to the Vermont Supreme Court rather than to guess as to the meaning and construction of the Vermont statute.

Regardless, Vermont is functionally liable for judgments against VSAC. The record establishes that any judgment against VSAC would adversely impact the State of Vermont. If a judgment were entered and collected against VSAC, the State would be forced to either appropriate funds to pay that judgment or place at risk VSAC's ability to pay for the services that VSAC provides to Vermont residents. Moreover, by statute, Vermont can take control of the assets of VSAC at any time that the legislature chooses. Vt. Stat. Ann. tit. 16, §2821(b). As a result of Vermont's direct interests in the assets and liabilities of VSAC, VSAC is included in the State's annual report of the State's financial condition.

*Second,* VSAC is not an autonomous entity. Rather, its activities are tightly controlled by the State of Vermont. VSAC's governing body (its Board of Directors) is appointed in substantial part by the legislative and executive branches. The Governor selects the Chairperson of the Board. The State's power to appoint the members of the Board and its Chair stands as a significant factor in determining whether VSAC is autonomous. *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 547 (4th Cir. 2014). Numerous other facts cause this second factor to weigh in favor of VSAC. By statute, the Governor has been given control over the debt structure of VSAC. Additionally, VSAC is required to make numerous reports to

14

the Governor and legislature and must frequently appear before legislative committees. Moreover, the executive and legislative branches dictate many of the activities of VSAC and how VSAC is to spend the state assets entrusted to VSAC. In short, Vermont exercises extensive control over VSAC.

*Third,* as this Court recognized in *Oberg II*, VSAC is "focused on the statewide concern of facilitating postsecondary educational opportunities for residents of Vermont." 745 F.3d at 142. VSAC's purpose is "to provide opportunities for persons who are residents of Vermont to attend colleges," as well as "to provide career, educational, and financial aid counseling and information services." Vt. Stat. Ann. tit. 16, §2821(a).

*Fourth,* Vermont law clearly and unambiguously provides that VSAC is a state agency. Vt. Stat. Ann. tit. 16, §2821(c) (VSAC is a Vermont "state agency"); Vt. Stat. Ann. tit. 16, §2823(a) (VSAC "shall be an instrumentality of the State"); Vt. Stat. Ann. tit. 32, §5932(1) (declaring VSAC to be "a unit of state government"). Moreover, Vermont treats VSAC as a state agency in a myriad of ways, including exempting VSAC's property and income from taxation. Principles of federalism dictate that the State's consistent view that VSAC is a state agency— and should be treated as such—is entitled to deference. This Court correctly recognized that this fourth factor weighs in favor of VSAC. *Oberg II*, 745 F.3d at 142.

## ARGUMENT

This Court reviews a district court's grant of summary judgment *de novo*. *Dash v. Mayweather*, 731 F.3d 303, 310 (4th Cir. 2013). Summary judgment is appropriate where, as here, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To "show that a genuine dispute does, in fact, exist," Oberg "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash*, 731 F.3d at 311.[2] To determine whether a state-created entity like PHEAA or VSAC is exempt from FCA liability, this Court balances the four nonexclusive factors it employs to determine arm-of-the-state immunity. *Oberg I*, 681 F.3d at 579-80. Based on the fully developed factual record, all four factors support the District Court's conclusion that PHEAA and VSAC are arms of the State.[3]

---

[2] Oberg labors under the misimpression that whether PHEAA and VSAC are arms of the State is a question for the jury. *See, e.g.*, Br. 7, 8, 9, 16, 17. But "whether an entity constitutes an arm of the state … is a question of law." *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 602 (11th Cir. 2014); *see also Nixon v. Belmont-Harrison Juvenile Dist., Sargus Juvenile Ctr.*, 113 F. App'x 51, 54 (6th Cir. 2004). This critically if not fatally undermines Oberg's appeal, for what Oberg insists are genuine issues of material fact are not actually matters for the jury. *See, e.g.*, *Venkataram v. Office of Info. Policy*, 590 F. App'x 138, 140 n.1 (3d Cir. 2014) (per curiam).

[3] Oberg misleadingly suggests (at 12-13) that arm-of-the-state status is appropriate only when an entity demonstrates that "a judgment against the defendant create[s] a liability against the State itself" *and* that the lawsuit is "an

## I.  PHEAA Is An Arm Of The Commonwealth.

### A.    Pennsylvania Would Be Liable for a Judgment Against PHEAA.

The undisputed facts established during discovery show that Pennsylvania retains significant control over PHEAA's financial affairs and would be "functionally liable … if not legally liable" for a judgment against PHEAA.  *Oberg II*, 745 F.3d at 137 (quotation marks omitted); JA 3667.

*First*, *all* revenues that PHEAA generates *must* be deposited into the State Treasury.  JA 339-42, 671-76, 2474; 24 P.S. §5104(3).  The record confirms that PHEAA-generated revenues, although nominally earmarked for the "Educational Loan Assistance Fund" (ELAF), are commingled with the Commonwealth's general fund, and that the State Treasurer has exclusive authority to invest them consistent with the Pennsylvania Fiscal Code, 72 P.S. §301.1.  JA 339, 675.  Discovery revealed that PHEAA has no actual control over the investment of PHEAA funds and has never provided the State Treasurer with guidelines for the investment or use of those funds.  JA 339.  PHEAA's assets are exempt from state taxation, as it would make no sense to tax the Commonwealth's own assets.  JA

---

offense to the sovereignty of the State."  That is plainly not the law, which requires this Court to carefully balance all four (non-exclusive) factors.  *See Oberg II*, 745 F.3d at 136-37 & n.4, 141.  This mischaracterization is representative of Oberg's legal overview (at 12-16), which distorts Oberg's cited decisions and completely disregards more recent Supreme Court and Fourth Circuit precedent (which appellees address *infra*).

2470-71, 2838, 2858; 24 P.S. §§5105.6, 5107. And upon PHEAA's dissolution, all of its property belongs to the Commonwealth. JA 237, 249, 2505; 24 P.S. §5109. Pennsylvania includes PHEAA's financial information in its annual financial reports because omitting such information "would be misleading." JA 345.[4] And the Governor annually requests that PHEAA report on all material outstanding claims—including this case—in connection with the Commonwealth's annual audit of its financial statements. JA 711; *cf. Hutto*, 773 F.3d at 544 (noting that "the State's ultimate responsibility for the financial soundness of the Retirement System is reflected by the fact that the Retirement System's actuarial valuation is relied upon in the preparation of the State's annual financial statement" (quotation marks omitted)).

*Second*, PHEAA's spending is significantly constrained by the Commonwealth. By legislative mandate, PHEAA must use its generated revenues exclusively to carry out its statutory purposes. JA 2427; 24 P.S. §5104(3). Indeed, it cannot spend *any* funds without receiving approval from the State Treasurer. JA 339-40; *see* 72 P.S. §§306–07, 1501–02. Oberg claims (at 23) that Treasury only

---

[4] Oberg downplays this point (at 23 n.8) because the report also includes an entity the Third Circuit has held not to be an arm of the State. But unlike most circuits, the Third Circuit does not expressly countenance the "functional liability" inquiry, *see Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 233 (3d Cir. 2006), and the inclusion of PHEAA's finances in the report bears on the Commonwealth's functional liability.

reviews "backup documentation," but his own citations and the undisputed evidence establish that, in actuality, Treasury's examination of every PHEAA spending request is "not ministerial in nature" and instead involves a comprehensive, multi-step process involving several levels of submission, substantive review, and authorization.  JA 673-74, 2539-40; *see also* JA 340-41, 2427-28.  As the thousands of examples of requisition questions and denials produced in discovery clearly show, Treasury's review is no mere rubber stamp. JA 565-80, 2478.[5]  Checks provided to PHEAA following that review, moreover, are drawn on the Commonwealth's account and signed by the State Treasurer.  JA 341.

*Third*, as Pennsylvania itself has expressly and consistently recognized, PHEAA is "fiscally dependent" on Pennsylvania in many ways.  JA 334, 346, 596. Like a typical Commonwealth agency, PHEAA must submit annual budget appropriation requests to the Pennsylvania Secretary of Budget to obtain money for the programs it administers for the benefit of Pennsylvanians.  JA 336, 338.  At its discretion, the Pennsylvania legislature appropriates funds to PHEAA for those programs.  JA 328-32.  The legislature limits the amount of debt PHEAA may incur, JA 242; 24 P.S. §5105.1(a.1), and PHEAA's debt issuances require

---

[5] For example, after receiving a $63 invoice from PHEAA's outside counsel seeking reimbursement for a meal, Treasury demanded an itemized receipt from PHEAA and inquired whether the meal included alcohol.  JA 580.

gubernatorial approval, JA 250, 333-34, 2469; *see* 24 P.S. §§5104(3), 5105.1(a). The Governor also enjoys *de facto* authority to instruct PHEAA to reduce or freeze its spending.  JA 338-39; 2429-30.  PHEAA must report on its financial condition to the legislature and Governor each fiscal year, and all of its activities may be— and have been—audited by the Commonwealth's Auditor General.  JA 246-47, 249 (noting audit of PHEAA's 2004-2007 performance); 24 P.S. §§5104(1.1), 5108.

The record thus demonstrates that all PHEAA-generated revenues go to the Commonwealth's Treasury, where they are considered Commonwealth assets; PHEAA can only spend that money with Commonwealth approval and consistent with its statutory mission; and PHEAA is, at bottom, fiscally dependent on the Commonwealth, which is pervasively involved in PHEAA's financial affairs.  For good reason, then, the Chair of PHEAA's board, Rep. William Adolph, Jr.—also Chair of the House Appropriations Committee of the Pennsylvania legislature— testified unequivocally and without contradiction that a monetary judgment against PHEAA "would be paid with the Commonwealth's money."  JA 248.  A judgment against PHEAA "would also negatively impact the amount of money that PHEAA is able to contribute to the state grant programs and [PHEAA's] ability to administer those programs."  *Id.*  And if a significant judgment were entered against PHEAA, the legislature "would have no choice but to appropriate money

(as it has done in the past) to PHEAA to allow for its continued operation or substantially reduce or do away with its grant programs." *Id.*

In *Oberg II*, where it could rely only on the pleadings and statutes, this Court determined that PHEAA had not demonstrated the Commonwealth's functional liability because "PHEAA would pay any judgment in this case with its own moneys from its segregated fund." 745 F.3d at 139. Now, after discovery, the summary judgment record leaves no doubt that a judgment against PHEAA would be paid from funds in the State Treasury, deplete the Commonwealth's coffers, and interfere with Pennsylvania's fiscal autonomy, establishing functional liability. *See Hutto*, 773 F.3d at 546 (functional liability where judgment would "implicate South Carolina's Treasury"); *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 263-64 (4th Cir. 2005) (functional liability where entity's funds are "either held in the Treasury or restricted as to use," since an "award from those funds would directly interfere with the state's fiscal autonomy" (quotation marks omitted)); *Ristow v. S.C. Ports Auth.*, 58 F.3d 1051, 1054-55 (4th Cir. 1995) (arm-of-the-state status where "practical effect" of State's "treatment of the fiscal affairs" of entity "definitively implicates the state treasury," and judgment against entity would implicate "the ebb and flow of funds into and out of [the] treasury");

*Lesinski*, 739 F.3d at 605; *United States ex rel. King v. Univ. of Tex. Health Sci. Ctr.-Houston*, 544 F. App'x 490, 497 (5th Cir. 2013).[6]

Oberg's response to these undisputed facts is to misstate the law and mischaracterize the record in an effort to manufacture a factual dispute. He begins by accusing the District Court of "[d]isregarding" this Court's decision in *Oberg II*. Br. 17-19, 22. But a reversal of judgment on the pleadings hardly guarantees a litigant victory on the summary judgment record. Indeed, the whole point of the remand was to develop the summary judgment record that was missing at the "early stage" of the litigation and that, now developed, amply confirms the Commonwealth's functional liability for a judgment against PHEAA and, more generally, PHEAA's arm-of-the-state status. *See* JA 3667.

In apparent recognition that *Oberg II* is not dispositive, Oberg pivots to the misguided assertion (at 19) that PHEAA maintains "millions of dollars" in an "operations account" at M&T Bank. Oberg misrepresents the factual record. Like any other Commonwealth agency, with the State Treasurer's approval, PHEAA

---

[6] The record also establishes that Pennsylvania would be legally, as well as functionally, liable for a judgment (but for the sovereign immunity of both the Commonwealth and PHEAA). Although isolated portions of PHEAA's lengthy enabling act state that "no obligation of the agency shall be a debt of the State," 24 P.S. §5104(3), context makes clear that those provisions address debt obligations and other financing responsibilities, not liability for a *judgment* against PHEAA, *id.*; JA 248. The Act elsewhere uses the term "money judgments," 24 P.S. §5104(11), but does not do so here.

uses the M&T Bank operations account solely to process certain expenditures that must be paid faster than the usual requisition process allows.  JA 341-42, 2477. Like all PHEAA spending, those expenditures are also subject to State Treasurer approval.  *See* JA 341-42, 2477.

Oberg's claim (at 19) that PHEAA "has billions of dollars in assets" in special purpose entities (SPEs) is another red herring.  The SPEs are simply Delaware trusts and LLCs that formally issue PHEAA's bonds (the proceeds of which finance student loans) because that results in lower debt costs than if PHEAA directly did so.  JA 2442-43.  The entities legally hold student loan receivable assets (which back the bonds), just as PHEAA would legally hold those assets if it directly issued bonds.  This is all fully disclosed in PHEAA's financial statements, and the entity-held loan receivables are listed as assets on PHEAA's balance sheet.  JA 2443-46, 2750, 2753-55, 2782.[7]  Oberg's assertion (at 19) that the SPEs' assets "are not in the State Treasury or accessible to the Commonwealth of Pennsylvania" is irrelevant; that is true of any Commonwealth agency's assets. And all money *generated by* the SPEs (due to payment of the underlying loans)

---

[7] Thus, Oberg's attempt to ascribe nefarious intent to PHEAA by asserting (at 19) that it "off-shored" assets is a blatant falsehood.

"goes to [the] State Treasury," where it is treated like all PHEAA-generated revenue.  JA 2443-44.[8]

Equally unavailing is Oberg's contention (at 20) that PHEAA-generated revenues deposited into the State Treasury remain segregated in a "Discretionary Fund" that only PHEAA can use.  First, this argument "celebrates form over substance" and ignores this Court's admonition that the arm-of-the-state analysis "does not focus on whether funds are retained in a particular account of the State or in the general fund of the State treasury."  *S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 305 (4th Cir. 2008); *accord Michigan v. United States*, 40 F.3d 817, 829 (6th Cir. 1994).  Regardless, it fails on its own terms because, in actuality, "[*a*]*ll* PHEAA funds held in the Treasury," including those in the "Discretionary Fund," are commingled with Treasury funds and "are funds of the Commonwealth" that Pennsylvania owns and controls.  JA 2447 (emphasis added); *see also* JA 248, 339-41, 2427, 2431, 2474.  Oberg is therefore flatly wrong to suggest (at 21-22) that PHEAA may unilaterally

---

[8] Oberg's assertion (at 20 n.5) that a judgment in this case "likely would be paid by the trusts rather than PHEAA" is pure speculation.  PHEAA's General Counsel noted only his "understanding [that] PHEAA wasn't making a payment" in two previous cases unrelated to this one.  JA 2848.  Even if true, Oberg does not contend that this somehow diminishes the Commonwealth's functional liability.  Nor could he, since the trusts are included on PHEAA's books and their disbursements—like all PHEAA-generated revenues—go to the State Treasury.

"withdraw" funds from the State Treasury "at its discretion" like an ordinary mutual fund investor or bank depositor.

In a final effort to deny functional liability, Oberg asserts (at 24) that "PHEAA could easily fund a judgment from its own resources." However, the Supreme Court, this Court, and other circuits hold that the state's "*potential*" liability, and not the entity's current ability to pay, is the key. *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 430-31 (1997) (emphasis added). An arm of the State does not lose that status just because it is flush at a particular juncture. "'[T]he proper inquiry is not whether the state treasury would be liable in *this* case, but whether, hypothetically speaking, the state treasury would be subject to potential legal liability *if* the [entity] did not have the money to cover the judgment.'" *Hutto*, 773 F.3d at 545 (quoting *Ernst v. Rising*, 427 F.3d 351, 362 (6th Cir. 2005)); *see also Lesinski*, 739 F.3d at 605; *Pub. Sch. Ret. Sys. of Mo. v. State St. Bank & Trust Co.*, 640 F.3d 821, 830 (8th Cir. 2011).[9] This rule makes perfect sense in light of the fact that the damages sought in any particular case are frequently unknown—and unknowable—at the outset of a case, when immunity

---

[9] Oberg invokes *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994), but that decision predates *Doe* and also stated the relevant question in terms of *potential* liability. *See id.* at 51 ("*If* the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise?" (emphasis added)); *see also id.* (question applies "both legally and practically").

issues should be determined.  A state entity is not somehow less an arm of the State at the beginning of a particular case, when a single plaintiff seeks insubstantial damages, than later on, when the case may have evolved into a multi-plaintiff class action seeking extraordinary damages far greater than the defendant's ability to pay.

This caselaw underscores the Commonwealth's functional liability, because Rep. Adolph testified without contradiction that a "significant judgment" against PHEAA would require the legislature "to appropriate money … to PHEAA to allow for its continued operation."  JA 248.  And that conclusion is consistent with PHEAA's history.  For its first two decades as a Commonwealth agency, PHEAA required legislative appropriations to fund its own operations.  During that period of relative financial hardship, there is no question that the Commonwealth would have been on the hook to pay a judgment against PHEAA.  There is no principled basis for rescinding PHEAA's status as an arm of the Commonwealth simply because it now enjoys financial success by discharging its statutory mission— saving Pennsylvania taxpayers money while also facilitating their access to higher education.  In all events, Rep. Adolph also testified without contradiction that a judgment "in *this* lawsuit" would "be paid with the Commonwealth's money."  JA

248 (emphasis added).   In short, the record confirms the Commonwealth's functional liability.[10]

### B.     Pennsylvania Exercises Pervasive Control over PHEAA.

PHEAA's lack of autonomy also supports PHEAA's arm-of-the-state status. In *Oberg II*, this Court held that, at the motion-to-dismiss stage, "the facts relevant to this second factor cut both ways."  745 F.3d at 139.  The undisputed facts in the fully developed record now show that this factor clearly points one way:   the Commonwealth unquestionably exercises pervasive control over PHEAA's powers, governance, financial activities, and legal affairs.

*First*, Pennsylvania created PHEAA by statute and exercises plenary control over the agency's powers and obligations.   JA 249.  PHEAA derives its limited statutory powers and obligations solely from the Commonwealth and "has only the powers and degree of independence necessary for it to carry out the tasks assigned to it by the [Commonwealth]."   *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 948 F. Supp. 400, 413 (D.N.J. 1996), *aff'd*, 131 F.3d 353 (3d

---

[10] Were PHEAA a plaintiff, there would be no question that this factor supports arm-of-the-state status, since the relevant inquiry in that circumstance is "whether any recovery by the entity as plaintiff will inure to the benefit of the State," *Oberg II*, 745 F.3d at 137 n.4 (quotation marks omitted), and PHEAA's revenues (from whatever source) are routed to the State Treasury for use by the Commonwealth. But it cannot be that an entity's arm-of-the-state status depends on whether it is a plaintiff or defendant in a particular case.   Because this factor would strongly support PHEAA's arm-of-the-state status as a plaintiff, so too does it support the same outcome where PHEAA is a defendant.

Cir. 1997), *aff'd*, 527 U.S. 666 (1999); *see* 24 P.S. §§5102, 5105.6. Far from autonomous, PHEAA owes its creation and continued existence to the Commonwealth, as the legislature can change PHEAA's powers and duties at any moment or even dissolve PHEAA altogether. JA 249; *see Oberg II*, 745 F.3d at 141 (right to alter entity's structure constitutes "important oversight authority"); *Brennan v. Univ. of Kan.*, 451 F.2d 1287, 1290 (10th Cir. 1971).[11]

*Second*, the Commonwealth exerts significant influence over PHEAA through its power to appoint and remove *all* twenty of PHEAA's board members. *See* JA 248; 71 P.S. §111.2(b)(1); Pa. Const. art. VI, §7; *Hutto*, 773 F.3d at 547 ("The means by which the entities' officers are appointed suggest that the [entity] is beholden to the State."). By controlling the composition of PHEAA's board, the Commonwealth exercises "absolute control" over PHEAA and its policies, stripping the agency of any true autonomy. JA 248; *see, e.g.*, *Oberg II*, 745 F.3d at 144; *Hoover*, 535 F.3d at 307; *Md. Stadium Auth.*, 407 F.3d at 264.

Fatally, Oberg does not dispute the Commonwealth's complete control over the board. Instead, grasping at straws, he contends that the board has no role in PHEAA's day-to-day operations and maintains only superficial interactions with

---

[11] As *Oberg II* impliedly recognized, *Hess* is not to the contrary. *Contra* Br. 31. *Hess* rejected the proposition that a State's power to "destroy or reshape any unit it creates" is "dispositive" to the sovereign immunity inquiry, not that it is irrelevant. 513 U.S. at 47-48.

the Commonwealth.  Br. 26-27.  Oberg is wrong as a matter of law and fact.  On the law, day-to-day operational control is hardly the *sine qua non* of "state control."  What is "powerful evidence of state control" is the "state['s] authority to appoint all of an entity's decisionmakers," *Oberg II*, 745 F.3d at 144, to say nothing of its power to remove all of them.  Both features are present here.  On the facts, the board is intimately involved in formulating and shaping PHEAA's policy, operations, and budget.  The legislature "has vested PHEAA's Board of Directors with the authority to govern PHEAA within the strict guidelines of PHEAA's enabling statutes."   JA 249.  The board in turn "tasks PHEAA's executives and managers with implementing those decisions and directions on a day-to-day basis." *Id.*[12]

*Third*, as explained above, the undisputed evidence shows that the Commonwealth controls PHEAA's financial affairs.  All revenues generated by PHEAA go into the State Treasury; the State Treasurer must approve all of PHEAA's expenditures and controls investment of its revenues; the Governor possesses veto power over PHEAA's bond, note, and debt issuances, can instruct PHEAA to reduce or freeze its spending, and negotiates the collective bargaining

---

[12]  Because the board appoints PHEAA's officers, who manage day-to-day operations, Oberg's attempt to impugn the board by asserting (at 26) that one member "had almost no understanding of PHEAA's operations" is spurious.  That same member consistently stated that PHEAA's President would know about the day-to-day issues of which he was not intimately aware.  JA 3335, 3341, 3346.

agreement for PHEAA's union employees; and the legislature limits the amount of PHEAA's debt. *See* pp. 4-5, 17-20, *supra*; *Md. Stadium Auth.*, 407 F.3d at 264 (noting that "[w]hile the University can issue revenue bonds, it may do so only after receiving legislative approval").[13]

The Commonwealth's fiscal oversight does not end there. PHEAA "must provide the Pennsylvania Legislature with a report of its fiscal condition annually." JA 3670; *see also* JA 246-47; *cf. Hutto*, 773 F.3d at 547 (state control where entity must provide reports to legislature). Furthermore, PHEAA "is subject to audit by the Pennsylvania Auditor General." JA 3670; *see also* JA 249. Oberg concedes these points but argues (at 30) that the Auditor General has conducted only one "special" audit in 2008 (for the 2004 to 2007 period). But the concession is critical, since it is the State's auditing *authority* that is a tell-tale sign of state control. *See Md. Stadium Auth.*, 407 F.3d at 264 (state control where entity "is subject to" audit by State); *Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1311 & n.2 (11th Cir. 2000) (state control where State "reserve[s] … the right … to conduct an audit"). And the 2008 audit amply demonstrates PHEAA's lack of autonomy. That extensive audit resulted in the

---

[13] Oberg's assertion (at 28) that "the Governor has never declined a PHEAA request for a debt issuance" misstates the record. The cited testimony actually states that PHEAA's General Counsel was "told that it's occurred," but had no "personal knowledge of it occurring." JA 2858.

firing of PHEAA's President, a legislative restructuring of its board (the audit's top-line recommendation), and the elimination of employee incentive payments. JA 249, 2322, 2482, 2810-11. The far-reaching nature and consequences of the 2008 audit *by the Commonwealth* cannot be squared with Oberg's contention that PHEAA is meaningfully autonomous *from the Commonwealth*.[14]

Oberg states that PHEAA has not received legislative appropriations for administrative costs since 1988. Br. 18, 31. But that does not reflect autonomy from the Commonwealth, financially or otherwise. This is just another effort by Oberg to use PHEAA's relative success to strip PHEAA of its arm-of-the-state status. PHEAA is no less sovereign because, after twenty years of contrary experience, it does not currently need legislative appropriations to cover administrative expenses (although it does receive annual appropriations for program activities). Moreover, given the ever-changing economic and regulatory conditions affecting PHEAA's operations, there is no guarantee that appropriations for administrative expenses will not be needed in the future, at which point

---

[14] Oberg is left to argue (at 30-31) that PHEAA "was not required to accept" the audit's recommendations. But caselaw holding that audits indicate state control has never turned on that unremarkable feature of most audits. Moreover, by conceding that it took PHEAA board action to implement the audit's far-reaching recommendations (at 31), Oberg refutes his own claim of a passive, impotent PHEAA board (which, among other things, fired PHEAA's President).

31

PHEAA will not somehow become more sovereign.[15]  Oberg's rule would punish an agency for having a revenue source or, as here, for developing efficiencies that have weaned it from needing annual appropriations for administrative expenses.

In all events, the lack of legislative appropriations for administrative expenses does not establish or even suggest a lack of Commonwealth control, which is the relevant inquiry.  While, at the motion-to-dismiss stage, the *Oberg II* Court could observe that PHEAA is "financially independent," the summary judgment record establishes that the Commonwealth's control permeates all of PHEAA's fiscal activities, as explained.  *See* JA 334, 346, 596 (noting that PHEAA is "fiscally dependent" on Pennsylvania).  In particular, Treasury must approve all of PHEAA's spending, including for administrative expenses.  Thus, while PHEAA does not currently require Commonwealth outlays for its administrative expenses, the Commonwealth retains a substantial check on those expenses—since, at bottom, they are paid with the Commonwealth's money.  *See* JA 336-38.

*Fourth,* while *Oberg II* held on the pleadings that PHEAA has "the power to enter into contracts, sue and be sued, and purchase and sell property in its own name," 745 F.3d at 139, the summary judgment record confirms that Pennsylvania significantly restricts PHEAA's ability to engage in these activities and, more

---

[15] For example, Congress in 2010 abruptly prohibited entities other than the federal government from originating federally guaranteed student loans, which will affect PHEAA's revenues.  JA 327, 2536.

broadly, to manage its own legal affairs.  As Oberg concedes (at 29), the Attorney

General of Pennsylvania reviews the form *and* legality of *all* PHEAA contracts,

deeds, settlements, and leases over $20,000, and those agreements lack the force of

law without Attorney General approval.  JA 713-14, 2847-48; 71 P.S. §732-204(f).

In undertaking this substantive review, the Attorney General must determine,

among other things, that (1) PHEAA has the authority to enter into the contract; (2)

the contract has all of the legal terms the Commonwealth requires and no terms

that are prohibited; (3) the contract was obtained through appropriate bidding

processes; (4) the contract is valid under the Commonwealth and Federal

Constitutions; (5) the contract is lawful, enforceable, and in the best interest of the

Commonwealth; and perhaps most tellingly, (6) the contract does not waive the

Commonwealth's sovereign immunity or subject PHEAA to taxes.   JA 713-14,

2837-38, 2841.   The Attorney General will not approve a PHEAA contract

involving a party with an outstanding debt to Pennsylvania.  JA 2856-57.  The

Commonwealth thus "retains a veto over" PHEAA's ability to enter into contracts

and buy or sell property, limiting the agency's legal autonomy.  *See Md. Stadium

Auth.*, 407 F.3d at 264; *accord King*, 544 F. App'x at 497.

The Attorney General's oversight of PHEAA's legal affairs goes further.

PHEAA has no general and unimpeded power to bring suit.  For any suit other than

a loan collection action, the Attorney General must represent PHEAA unless and

until she approves a delegation request by PHEAA to assume its own representation. JA 764; 71 P.S. §732-204(c); *cf. Hutto*, 773 F.3d at 547 (finding state control where "State must defend … the members of the Retirement System Investment Commission"). Thus, except for collections, PHEAA cannot undertake its own suit (much less retain private counsel) without Attorney General approval. Even after delegation, PHEAA must obtain Attorney General approval before pursuing an appeal or entering into a settlement agreement. JA 764-65, 2845, 2847-48.[16]

Additional undisputed facts in the record demonstrate PHEAA's lack of control over its legal affairs. For one, PHEAA must comply with the Commonwealth's Right-to-Know and Open Meetings laws. JA 3674-75; *see* 65 P.S. §67.102; 65 P.S. §703. For another, absent judicial override, PHEAA is bound by any legal advice or opinions provided by the Attorney General about PHEAA's powers or duties as a Commonwealth agency. JA 714; 71 P.S. §732-204(a). Finally, while PHEAA may enact regulations necessary to carry out its delegated governmental function, those regulations must be approved by Pennsylvania's Regulatory Review Commission. JA 711.

---

[16] Unable to rebut these undisputed facts, Oberg again resorts to the purportedly "superficial" nature of the Commonwealth's oversight. Br. 28-30. But the arm-of-the-state doctrine is not an invitation for federal courts to grade the quality of state oversight. It is the Commonwealth's indisputable *authority* to veto PHEAA's legal decisions that is relevant. *Cf.* p. 30, *supra*.

### C. PHEAA's Operations Advance the Compelling Statewide Concern of Improving the Higher Education Opportunities of Pennsylvania Citizens.

PHEAA's primary focus on discharging a critical sovereign function of Pennsylvania strongly supports arm-of-the-state status. As the factual record shows, PHEAA is primarily involved with statewide sovereign concerns because all of its operations, including its national loan servicing and guaranteeing activities, benefit Pennsylvania and its citizens by advancing the agency's sovereign mission of ensuring and improving Pennsylvanians' access to higher education. *See* JA 326-27, 332-33, 620-21, 3672-73.

PHEAA was established to perform the essential governmental function of improving educational opportunities for Pennsylvanians. JA 245-46, 620-21. To achieve that end, PHEAA administers numerous state grant and financial aid programs for Pennsylvanians. JA 327-32. In addition, pursuant to its statutory mandate, PHEAA contracts with entities outside of Pennsylvania to purchase, service, and guarantee loans, which allows it to generate revenues that also "entirely and exclusively" benefit Pennsylvanians to the tune of millions of dollars every year. JA 246, 327, 332-33, 620, 2392. For good reason, then, this Court concluded, even on the motion-to-dismiss record, that PHEAA's "work is clearly of legitimate state concern." *Oberg II*, 745 F.3d at 140; *cf. Md. Stadium Auth.*, 407 F.3d at 265.

35

Oberg does not seriously dispute that PHEAA's activities redound "entirely and exclusively" to the benefit of Pennsylvanians.[17]  Instead, he principally argues (at 33) that because a majority of PHEAA's revenue and income has been deemed to derive from out-of-state activity, PHEAA is thus primarily involved with non-state concerns.  But that mixes apples and oranges.  A sovereign entity that discharges a sovereign function well enough to attract opportunities and revenues from out of state does not become any less sovereign in the process.  Oberg hypothesizes (at 34) that under the District Court's ruling, "PHEAA could provide no services whatsoever to Pennsylvanians, conduct all of its operations outside the State, and still be acting within an area of 'State' concern so long as all profits of the enterprise were returned to the Commonwealth."  Oberg does not explain how a state agency could return all out-of-state profits to its home State and yet provide "no services" to that State.  But the Court need not grapple with that logical incongruity here, because it is undisputed that PHEAA *does* provide services to Pennsylvanians—administering and generating millions of dollars annually to

---

[17] Oberg claims only (at 36) that PHEAA does not "generate[] earnings solely to return to Pennsylvania students" because it previously paid "rich executive salaries."  But this Court has disregarded an entity's compensation practices when determining whether it primarily focuses on statewide concerns.  *See Md. Stadium Auth.*, 407 F.3d at 259, 265.  Moreover, compensation is subtracted before earnings, so whatever PHEAA pays its personnel, its earnings still redound solely to the benefit of Pennsylvania students.  To the extent Oberg means that earnings "solely" go to Pennsylvanians only if PHEAA pays *no* salaries, nothing in law or reason supports that absurd proposition.

facilitate the "legitimate state concern" of higher education assistance—and has virtually all of its operations and personnel in Pennsylvania.

That highlights the broader problems with Oberg's focus on the percentage of in-state and out-of-state funds that PHEAA generates for the benefit of Pennsylvania. Far more relevant are the undisputed facts that PHEAA's loan servicing operations redound "entirely and exclusively" to the benefit of Pennsylvania and its citizens and that, during the relevant period, 99% of PHEAA's employees worked in Pennsylvania and were treated as Commonwealth employees for purposes of payroll, retirement, and healthcare. JA 246, 327, 332-33, 343-44; *see Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1255 (10th Cir. 2007) (agency was primarily concerned with state affairs because employees were "classified and treated as state employees"). Oberg would jettison these important considerations simply because a majority of funds *generated by* Pennsylvania citizens and *returned to* Pennsylvania citizens, happened to come from activities outside Pennsylvania.[18]

---

[18] Indeed, the nature of those ex-Pennsylvania activities further supports PHEAA's sovereign character. For example, under federal law, only state agencies and non-profit private organizations may guarantee non-resident loans. *See* 20 U.S.C. §1085(j). The federal government thus recognizes that PHEAA (which is not a non-profit private organization) is a state agency; in fact, PHEAA guarantees loans in Delaware, West Virginia, and Georgia *at the federal government's request*. JA 333.

37

Certainly, it would make no sense to hold that an arm of the State loses that status by discharging a sovereign function efficiently enough to provide that service to non-residents in a manner that ultimately redounds to the benefit of in-state residents in the form of ever more efficient services and additional tuition grants. If, for example, one State develops a better system for processing toll road payments or guaranteeing student loans or educating students such that other States or non-residents use those services, those functions are no less sovereign functions and the efficient arm of the State is no less an arm of the State. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985) ("The science of government … is the science of experiment." (quotation marks omitted)). Nothing in arm-of-the-state doctrine suggests that a state agency should be penalized for its success.

Nor does it make sense to deprive an arm of the State of that status just because it engages in substantial out-of-state activities that redound to the benefit of in-state citizens. For example, as this Court has acknowledged, state universities are "[a]lmost universally" found to be arms of the State. *Md. Stadium Auth.*, 407 F.3d at 262-63 (citing cases). But state universities often engage in many out-of-state activities—*e.g.*, national recruiting, promoting their sports teams, and opening out-of-state, out-of-country, or "virtual" campuses—to increase revenues for the benefit of the State and its students. It would be wrongheaded to

suggest that a state university becomes any less an arm of the State because, like PHEAA, it enjoys great success and generates substantial revenues from out-of-state ventures that directly benefit the state and its citizens.

Finally, Oberg points to PHEAA's use of different business designations, such as "AES" and "FedLoan Servicing," and its purported refusal to lend to Pennsylvania students after 2008 because it was no longer "commercially desirable." Br. 35-36. Both arguments fail. First, PHEAA's use of trade names does not change the agency's primary concern of improving educational opportunities for Pennsylvanians. On the contrary, PHEAA employed those business designations solely to "enhance [its] value to Pennsylvanians" and achieve its statutory mission by, among other things, increasing its appeal to out-of-state students and servicing federal government loans, thereby generating more revenues for Pennsylvanians. JA 2461-64, 2753, 2986-87, 3429. Second, the undisputed facts show that PHEAA ceased lending to Pennsylvanians in 2008 not because it was no longer commercially desirable, but because the credit markets collapsed, leaving PHEAA with no access to funds to loan to *any* students—in *or* out of the State. JA 327. And in 2010, federal law prohibited origination of federally guaranteed student loans by non-federal-government entities. *Id.* As a result, Oberg's insinuation (at 36) that PHEAA allegedly treats out-of-state students better than Pennsylvania students is misleading. PHEAA does not *loan* to

residents of *any* State. But PHEAA does *service* loans to residents from any State—including Pennsylvania.

**D.    Pennsylvania Treats PHEAA as a Commonwealth Agency.**

The record overwhelmingly confirms that PHEAA is a Commonwealth agency under Pennsylvania law. PHEAA's enabling legislation expressly states that PHEAA "will be performing an essential governmental function" and the "creation of the *agency* is in all respects for the benefit of the people of the Commonwealth." 24 P.S. §5105.6 (emphasis added). Notably, that enabling legislation took effect only by "amendment to the Constitution of Pennsylvania authorizing grants or loans for higher educational purposes." *Id.* §5112; *Oberg II*, 745 F.3d at 140; *Bowers v. NCAA*, 475 F.3d 524, 548 (3d Cir. 2007) (finding that University of Iowa's creation under state constitution supported immunity).

Consistent with its state agency status, PHEAA must comply with Pennsylvania's Right-to-Know and Open Meetings laws. It is exempt from state taxes and statutes of limitations. PHEAA's managerial personnel must comply with state government ethics laws. Its employees are treated as Commonwealth employees for purposes of payroll, retirement, and healthcare, and their badges state: "Commonwealth of Pennsylvania State Employee." *See* p. 5, *supra*. Employees are also subject to the relevant provisions of the State Adverse Interest Act. 71 P.S. §§776.5–776.8. PHEAA's unionized employees are represented by

the American Federation of State, County and Municipal Employees; their compensation is governed by a union contract negotiated by the Governor's office, not PHEAA. JA 244. PHEAA may investigate potential fraud against it, and where there is evidence of criminal activity, PHEAA's board may issue subpoenas. 24 P.S. §5104(10)(iii). The legislature treats PHEAA as a Commonwealth agency, JA 246, as do the Chief Deputy Attorney General, *see* JA 3079 (testifying that PHEAA was "lock, stock, and barrel a state agency"), and the Auditor General, *see* JA 249 (finding that PHEAA is "a state agency accountable to Pennsylvania taxpayers").

Pennsylvania courts have repeatedly and consistently held that PHEAA "is undeniably an agency of the Commonwealth." *PHEAA v. Barksdale*, 449 A.2d 688, 689 (Pa. Super. Ct. 1982); *see Richmond v. PHEAA*, 297 A.2d 544, 546-47 (Pa. Commw. Ct. 1972); *PHEAA v. Reid*, 15 Pa. D & C.3d 661, 665-66 (Pa. Ct. Com. Pl. 1980). So have federal courts. *E.g.*, *Lang*, slip op. at 9-11. The lone case cited by Oberg, *Goldman v. SEPTA*, does not even mention PHEAA.

Against this tidal wave of authority and record evidence, Oberg argues (at 37-39) that PHEAA has described itself as a "public corporation" and "self-funded organization," rather than a "typical state agency," and does not treat its non-union managerial employees as Commonwealth employees. But what PHEAA calls itself is not the controlling inquiry under this factor; the dispositive question is

whether *Pennsylvania* treats PHEAA as a Commonwealth agency. *Hutto*, 773 F.3d at 548. The answer is yes, as every single branch of the Pennsylvania government has determined. And whether or not *PHEAA* treats its managers as Pennsylvania employees, those managers are treated as state officials under Commonwealth ethics law. JA 621, 715. Although Oberg cites a single Attorney General opinion mentioning an earlier determination (from 1967) that PHEAA "is a public corporation distinguishable from being part of the Executive Department," JA 3630, that determination has nothing to do with whether PHEAA is a Commonwealth agency. In Pennsylvania, the "Executive Department" consists of a small number of statewide officers. *See* Pa. Const. art. IV, §1. A "Commonwealth agency," by contrast, includes both "executive agenc[ies]" and "independent agenc[ies]"; PHEAA is defined as an "independent agency" and thus constitutes a "Commonwealth agency." 71 P.S. §732-102.[19]

Oberg also argues (at 38) that PHEAA has a line of credit with the Commonwealth "negotiated at arms-length." But the written agreement memorializing the "arms-length" line of credit actually confirms that PHEAA is a "government instrumentality of the Commonwealth of Pennsylvania." JA 3123. Moreover, intra-government lines of credit are unremarkable; the State Treasury

---

[19] The cited Attorney General opinion, which responded to an inquiry from PHEAA, *confirms* PHEAA's sovereign status because PHEAA could not seek such advice if it were not a "Commonwealth agency." 71 P.S. §732-204(a).

recently extended a $1.5 billion line of credit to the Commonwealth's General Fund. JA 675-76.

Finally, Oberg contends (at 39) that in two cases, PHEAA invoked federal diversity jurisdiction, and in a third case did not invoke sovereign immunity. But the record confirms that PHEAA asserted diversity jurisdiction "in error," JA 2848-50, and PHEAA is not obligated to raise sovereign immunity. Moreover, in all three cases, PHEAA did not disclaim arm-of-the-state status; indeed, it pleaded that it was a statutorily-created instrumentality of the Commonwealth. JA 3531, 3543, 3557. And jurisdiction was not challenged or addressed in any of the cases, rendering their jurisdictional implications irrelevant. *Cf. Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006). In any event, this Court's decision in *Hoover* confirms that an entity's prior claim of state citizenship does not foreclose a later finding that it is an arm of the State. *See* 535 F.3d at 301-02 (permitting state entity plaintiff initially asserting diversity jurisdiction to later switch positions in same case and argue that it was arm of the State).

* * *

In sum, based on the evidentiary record developed at the direction of this Court in *Oberg II*, the relevant factors all strongly support the conclusion that PHEAA is an arm of Pennsylvania. Because all PHEAA-generated revenues go to the Commonwealth Treasury, are commingled with Commonwealth funds, cannot

43

be spent without Commonwealth approval, and (like all PHEAA assets) are considered to be Commonwealth assets, a judgment against PHEAA would in actuality be paid with the Commonwealth's money and implicate the public fisc, rendering the Commonwealth at least functionally liable for the judgment. The Commonwealth has the power to appoint and remove every PHEAA board member; subjects PHEAA to reporting requirements, far-reaching audits, and significant financial constraints; and severely limits its ability to engage freely in legal matters. PHEAA is primarily if not exclusively concerned with the quintessential state interest of facilitating higher education opportunities for Pennsylvanians, and all of its operations redound to the benefit of Pennsylvanians. And Pennsylvania clearly considers PHEAA a state agency entitled to sovereign immunity under state law.

PHEAA has been a financially successful arm of Pennsylvania of late, but there is no basis in law or reason to strip a state agency's sovereign immunity because it has so successfully executed its statutory mission that it serves a broad customer base and saves taxpayers money. The District Court was entirely correct to hold that, based on the summary judgment record developed below, PHEAA is an arm of Pennsylvania. Its ruling should be affirmed.

## II.     VSAC Is An Arm Of The State.

In *Oberg II*, this Court, construing the pleadings in the light most favorable to the plaintiff, concluded that the first two factors[20] of an arm-of-the-state analysis are "close questions" with respect to VSAC at the motion to dismiss stage. This Court concluded, however, that the last two factors[21] "suggest" VSAC is an arm of the State. 745 F.3d at 142. The Court therefore remanded the case to the District Court so as to allow discovery on this issue.

The undisputed facts before this Court, following extensive discovery, demonstrate that all four factors fall decidedly in VSAC's favor. Consequently, the District Court properly granted summary judgment against Oberg and in favor of VSAC.

On appeal, Oberg attempts to cloud the issues by relying on discovery that is irrelevant to VSAC's summary judgment motion. For example, Oberg focuses his response almost exclusively on events occurring beyond the time period at issue. *See, e.g.*, Br. 42, 43, 51, 53, 54 (citing to JA 790-91, 795, 882-83, 2044, 3673). Oberg simply cites to no disputed issues of material fact that would preclude summary judgment. The District Court's decision should therefore be affirmed.

---

[20] First, whether the judgment will be paid by the State and, second, the degree of autonomy exercised by the entity.

[21] Third, whether the entity is involved with state concerns and, fourth, how the entity is treated under state law.

**A.    Because Vermont Is Functionally Liable for Judgments Against VSAC (Other than Certain Specified Loan Obligations), the First Factor Favors VSAC.**

The first factor to consider in assessing whether VSAC is a "person" subject to a *qui tam* action under the FCA is whether the judgment will be paid by the State of Vermont.  *Hoover*, 535 F.3d at 303.  The state treasury "is responsible 'where the state is functionally liable, even if not legally liable.'" *Hutto*, 773 F.3d at 543 (quoting *Oberg II*, 745 F.3d at 137); *see also Hess*, 513 U.S. at 50 (evaluating whether "as a practical matter" state treasuries would need to be expended for the agency to survive); *Ristow*, 58 F.3d at 1053 (court must consider "the practical effect" of a judgment on the state treasury).  As the court in *Lesinski* explained, "[s]hould judgment creditors deplete the [state agency's] funds to the point that it can no longer effectively function, the State would ultimately have to choose between increasing its appropriation to make up the shortfall or shirking its constitutionally mandated duty …."  739 F.3d at 605; *accord Hutto*, 773 F.3d at 544-45 (court should consider whether the State's appropriation to the state entity would need to be increased if it were to suffer adverse monetary judgments).  Here, as a practical and legal matter, a judgment against VSAC would adversely impact the State of Vermont.

The Vermont legislature has expressly stated that the State "shall support and maintain the Corporation."  Vt. Stat. Ann. tit. 16, §2823(a).  Under Vermont law,

46

the legislature's use of this phrase places an affirmative obligation on the State to undertake what it has said it will do. *See Daye*, 769 A.2d at 633-34 (statutory provision requiring State's prison system "to *maintain* security, safety and order at the correctional facilities" imposes a "fundamental obligation" on the State to do so (emphasis added)). Black's Law Dictionary defines "maintain" as to "bear the expense of," "supply with means of support," and to "sustain." Black's Law Dictionary 1105 (4th rev. ed. 1968); *see also* Webster's Third New International Dictionary 1362 (1966) (defining "maintain" as "to provide for: bear the expense of"). "Support" is defined as "furnishing funds or means of maintenance." Black's Law Dictionary 1609 (4th rev. ed. 1968); Webster's Seventh New Collegiate Dictionary 884 (7th ed. 1967) (defining "support" as "to pay the costs of"). Vermont's obligation to stand behind VSAC and to "furnish funds" needed to support and maintain VSAC renders Vermont functionally liable for a judgment against VSAC.

Other statutory provisions relating to VSAC further support the conclusion that Vermont is liable for any debt of VSAC, including a judgment, other than those specific loan obligations expressly disavowed by Vt. Stat. Ann. tit. 16, §2823(f). In section 2823(f), the Vermont legislature provides that certain specified notes and bonds issued by VSAC "shall not be deemed to constitute a debt or liability or obligation of the State of Vermont." By expressly disavowing

47

certain debts, the Vermont legislature has effectively dictated that all other debts, liabilities, and obligations of VSAC (such as the claims being brought in this case) stand as an "obligation of the State of Vermont." *Id.* Any doubt on this issue has been put to rest by the Vermont Supreme Court which has firmly embraced the principle of statutory construction *inclusio unius est exclusio alterius*. *In re Post*, 17 A.2d 326, 327 (Vt. 1941). In *Payne v. Rozendaal*, 520 A.2d 586, 593 (Vt. 1986), for example, the Vermont Supreme Court based its interpretation of Vermont's Fair Employment Practices Act on "the long established and applied maxim of statutory construction" that "[t]he inclusion of one thing (in a statute) implies the *exclusion* of others." By including a statutory provision that the bond indebtedness and notes of VSAC are not to be treated as obligations of the State of Vermont, the Vermont legislature has strongly implied that all other indebtedness of VSAC will be treated as obligations of the State.

Not only is the State of Vermont ultimately liable for any judgment against VSAC, the Vermont state treasury would be adversely impacted if VSAC did not have money to cover any judgment against it. *See Hutto*, 773 F.3d at 545. Although the funds available to fulfill VSAC's governmental purpose are physically within a segregated account, that fact is not dispositive. *See id.* That account consists of State appropriations and revenues generated by VSAC to carry out its governmental purposes. JA 179, 192, 211. The funds appropriated by

Vermont are substantial.  VSAC receives $17 to $20 million per year from the State of Vermont.  JA 179-80, 199.  Moreover, the funds available to carry out VSAC's mission—whether appropriations by the State or funds generated by VSAC's activities consistent with its legislative purpose—are funds of the State of Vermont.  By statute, the net earnings of VSAC (beyond that necessary to retire bonds and other obligations) inure solely to the benefit of the State of Vermont. Vt. Stat. Ann. tit. 16, §2821(b).

VSAC's assets and liabilities are all considered part of the State's assets and liabilities.  JA 193.  As a result, the assets of VSAC are included within Vermont's Comprehensive Annual Financial Report.  JA 184-85, 211-12.

If VSAC were to experience financial distress, it would have significant impact on the State of Vermont.  JA 181, 194.  Any judgment against VSAC would diminish VSAC's ability to perform its governmental function (e.g., providing funds for Vermont residents for higher education).  If a judgment were rendered against VSAC and Vermont were to refuse to make an appropriation to replace those funds, VSAC's ability to provide the services that Vermont citizens expect and have counted on from VSAC as a state agency would be impacted.  JA 190, 195-96.

Vermont stands as true owner of the assets of VSAC.  It can take control over any and all assets of VSAC at the stroke of a pen and use those assets

however it so chooses.[22]    Vt. Stat. Ann. tit. 16, §2821(b).    Given Vermont's

ownership of the assets of VSAC and the fact that those assets are included with

the State's Comprehensive Annual Financial Report, the insolvency of VSAC

"would harm the State's credit rating, making it more expensive for the State to

borrow money."  *Hutto*, 773 F.3d at 544.  Moreover, the funds that Vermont would

need to appropriate to continue the services that VSAC provides to Vermont

residents would assuredly increase if VSAC were to use currently available funds

to pay off a judgment against it.  *See id.* at 545; *accord Tucker v. Williams*, 682

F.3d 654, 659 (7th Cir. 2012) (consideration should be given to "whether a

judgment against the entity would result in the state increasing its appropriations to

the entity").

The undisputed facts before this Court demonstrate that the first factor

weighs in favor of VSAC.  To the extent there is any doubt in the mind of this

Court as to whether Vermont is legally liable for a judgment against VSAC, the

appropriate step would be to certify this issue of state law to the Vermont Supreme

---

[22] Citing *Hess*, 513 U.S. 30, Oberg asserts that the State's interest "as residual owner" of the entity's property is essentially irrelevant.  Br. 15.  In *Oberg II*, this Court observed that the holding of *Hess* is narrow and is directed to the treatment of compact entities under the Eleventh Amendment.  745 F.3d at 143-44 (noting that the entity at issue in *Hess* was a bistate Compact Clause entity with diffuse political accountability).  Here, consideration must be given to the fact that the assets of VSAC stand as assets of the State of Vermont and that any judgment against VSAC will have a fiscal impact on Vermont.  JA 184, 195-96.

Court for determination, rather than subjecting VSAC to continued litigation in federal court.[23]  Vt. R. App. P. 14.

### B. Because the Activities of VSAC Are Tightly Controlled by Vermont, the Second Factor Favors VSAC.

The second factor in this Court's arm-of-the-state analysis is whether the entity is substantially controlled by the State or whether the entity is autonomous from the State.  As with the first factor, this Court concluded in *Oberg II* that this factor was a "close question" given the pleadings of Oberg's complaint that must be accepted as true for purposes of a motion to dismiss.  745 F.3d at 141.  The discovery in this case and affidavits submitted in connection with the summary judgment motion now establish that this second factor is decidedly in favor of VSAC.

---

[23]  In his brief, Oberg asserts that "VSAC did not argue below that Vermont is *legally* liable for a judgment."  Br. 41.  Oberg, however, ignores the language of VSAC's briefs to the district court.  *See, e.g.*, VSAC's Reply Br. at 14 n.10 (District Court Document No. 718) ("Relator insists that 'it is now confirmed that Vermont is not legally liable for VSAC's debts' (Opp. at 18), but that is no more certain than when the parties began this case.  Vermont still *only* disavows liability for VSAC's debt obligations issued to finance loans for higher education; and *no* state law indicates a judgment could not be enforced against the State.").  VSAC has consistently maintained that as a result of Vt. Stat. Ann. tit. 16, §2823(a), (f), any judgment against VSAC is a judgment against Vermont—or at least functionally a judgment against Vermont.  This issue of Vermont law should be resolved by the Vermont Supreme Court through certification rather than having this Court guess as to the meaning and effect of this statute.

With respect to this second factor, the Court must "consider 'who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions,' as well as 'whether an entity has the ability to contract, sue and be sued, and purchase and sell property, and whether it is represented in legal matters by the state attorney general.'" *Hutto*, 773 F.3d at 546 (quoting *Oberg II*, 745 F.3d at 137). The more significant of these factors (who appoints directors/officers; who funds the entity; and the State's veto authority) favor VSAC.

Appointment of officers and board members is particularly important given that this appointment power suggests the entity is "beholden to the State." *Hutto,* 773 F.3d at 547. As this Court has stated, "one would have to be naive to conclude that the State lacks any influence or control when it has the power of appointment." *Id.* Of the eleven members of VSAC's Board of Directors, five are appointed by the Governor, one by the Vermont Senate, and one by the Vermont House of Representatives. Additionally, the State Treasurer serves as a board member. The remaining three members are elected by the other eight members. Vt. Stat. Ann. tit. 16, §2831. The Governor has the right to remove the Board Members he or she has appointed and has done so in the past. Vt. Stat. Ann. tit. 3, §258; JA 178, 1047-48. The Governor selects the Chairperson of VSAC's Board of Directors. Vt. Stat. Ann. tit. 16, §2832(a). The activities in which VSAC may engage are

expressly spelled out by the Vermont legislature. *See, e.g.*, Vt. Stat. Ann. tit. 16, §2823(e), (f).

The Vermont legislature has given the Governor complete control over VSAC's debt structure and loan obligations. Specifically, the Vermont legislature has declared that "[n]o debt obligation [of VSAC] may be effective without the approval in writing of the Governor." Vt. Stat. Ann. tit. 16, §2823(f). Elsewhere by statute, the Vermont legislature has reiterated that "[n]o resolution or other action of the Corporation providing for the issuance of such debt obligations may be effective without the approval in writing of the Governor." Vt. Stat. Ann. tit. 16, §2823(d). Moreover, VSAC must appear before the Vermont legislature to obtain appropriations to fund the services that it provides to Vermont residents. JA 179-80, 1034. The ability to dictate the financial resources available to an entity, of course, stands as an "ultimate weapon" of control and enforcement. *United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974).

VSAC is subjected to extensive reporting to the legislature and the executive branch. VSAC must make biennial reports to the Vermont legislature, and VSAC officers regularly testify before legislative committees. JA 179, 199. As this Court has recognized, such reporting reflects state control. *Hutto*, 773 F.3d at 547. VSAC must also submit an annual audit to the Vermont Secretary of Administration. Vt. Stat. Ann. tit. 16, §2835. That audit is conducted in

53

accordance with the Governmental Accounting Standards Board accounting standards—standards that are applicable to state governmental agencies. JA 186, 211. Additionally, VSAC must report on an annual basis to the Vermont Higher Education Investment Plan. JA 179.

The Governor and Vermont legislature have directed VSAC to provide various services and administer certain programs without providing appropriations to separately fund those services. JA 182, 211, 942. Additionally, the president of VSAC is required by state law to serve—without compensation—on various state boards. Vt. Stat. Ann. tit. 10, §541a(c)(5); Vt. Stat. Ann. tit. 16, §2905(b)(5). Thus, the assets held by VSAC and VSAC's employees are subject to control by the legislature and Governor.

Moreover, the Vermont legislature has made clear that the legislature maintains the right to change any aspect of VSAC's operations, structure, and mission whenever the legislature desires. The Vermont legislature has declared that: "The State reserves the right at any time to alter, amend, repeal, or otherwise change the structure, organization, programs, or activities of the Corporation, including the power to terminate the Corporation, subject to any limitation on the impairment of the obligations of any contract or contracts entered into by the corporation." Vt. Stat. Ann. tit. 16, §2821(b).

VSAC is an instrumentality of the State and is subject to control by the executive and legislative branches. Vt. Stat. Ann. tit. 16, §§2821(b), 2823(a). Although VSAC is an entity that has the State's authority to sue and be sued, JA 176, that fact is of little to no consequence in the analysis. *Hutto*, 773 F.3d at 547 (citing *Oberg II*, 745 F.3d at 139). Similarly, whether VSAC is "represented in legal matters by the state attorney general" is far from dispositive. *Id.* at 546 (quoting *Oberg II*, 745 F.3d at 137) (internal quotation marks omitted). It would make little sense to decide whether a state agency is subject to immunity based on the fluctuating workloads of the attorney general and whether the State views it to be more efficient to hire outside counsel for state entities (particularly when the matter involves an issue of significant complexity such as the FCA). *See* Vt. Stat. Ann. tit. 3, §154. Similarly, whether VSAC has the ability to purchase and sell property pales in comparison to the substantial control that the Governor and legislature wield over the State property that is being held by VSAC.

Having examined the undisputed evidence bearing on Vermont's control over VSAC, the District Court properly concluded that this factor weighs in favor of concluding that VSAC is an arm of the State of Vermont.

### C.   Because VSAC Is Primarily Involved with State Concerns, the Third Factor Favors VSAC.

"Higher education is an area of quintessential state concern and a traditional state governmental function." *Md. Stadium Auth.*, 407 F.3d at 265. Every activity engaged in by VSAC directly relates to that quintessential state concern. VSAC's purpose is "to provide opportunities for persons who are residents of Vermont to attend colleges," as well as "to provide career, educational, and financial aid counseling and information services." Vt. Stat. Ann. tit. 16, §2821(a).

In *Oberg II*, this Court properly concluded that VSAC is "focused on the statewide concern of facilitating postsecondary educational opportunities for residents of Vermont." 745 F.3d at 142. This third factor "suggest[s]" that VSAC is an arm of the State. *Id.*

Discovery has only strengthened the correctness of this Court's conclusion with respect to the third factor. In *Oberg II*, Oberg's principal attack on this third factor was a strained argument that VSAC had generated too much revenue from loans that do not have a nexus with Vermont. Not only is such an argument illogical in that any revenue generated by VSAC benefits Vermont residents and taxpayers, it has no basis in fact. The undisputed evidence is that during the relevant time period (2002-07), 97% of the loans originated by VSAC involved a borrower who was either a Vermont resident or attended school in Vermont. JA 187, 213.

Oberg's continued argument that this third factor weighs in his favor is frivolous.

### D.     Vermont Treats VSAC as a State Agency and Instrumentality of Vermont, Thereby Resulting in the Fourth Factor Favoring VSAC.

The fourth and final factor addressed in *Oberg II* is whether the entity is treated as an instrumentality of the State under state law.  This Court correctly observed in *Oberg II* that the fourth factor weighs in favor of concluding that VSAC is an arm of the State.

Vermont law expressly and unambiguously provides that VSAC "shall be an instrumentality of the State."  Vt. Stat. Ann. tit. 16, §2823(a).  The Vermont legislature has further declared that VSAC is a "unit of State government," Vt. Stat. Ann. tit. 32, §5932(1), and that VSAC is a "state agency," Vt. Stat. Ann. tit. 16, §2823(c).  State officials have repeatedly referred to VSAC, and held VSAC out as, an instrumentality of the State of Vermont.  Technical Bulletin TB-66, 2012 Vt. Tax LEXIS 4 (Sept. 5, 2012); Technical Bulletin TB-33, 2006 Vt. Tax LEXIS 6 (Nov. 28, 2006).  The legislative and executive branches have treated VSAC exactly how one would expect a state agency to be treated.  All real and personal property of VSAC is exempt from taxation.  Vt. Stat. Ann. tit. 16, §2825.  Moreover, all bonds, notes, and other obligations of VSAC are declared by the legislature to be "for an essential public and governmental purpose," and interest

thereon is exempt from income taxation. *Id.* Similarly, VSAC itself is exempt from all income taxation. *Id.*

Throughout Vermont's statutes, VSAC is treated as a state agency. VSAC is subject to Vermont's Open Meeting Law. Vt. Stat. Ann. tit. 1, §§310–314. VSAC is also required to comply with the Vermont Public Records Law. Vt. Stat. Ann. tit. 1, §§315–320. Because VSAC is a state agency, VSAC and its Board are listed on the State of Vermont Organizational Chart in the Vermont Financial Report. JA 212, 225.

The Vermont legislature's treatment of VSAC as a state agency should be afforded deference. The central purpose of state sovereign immunity is to accord States the respect owed to them as joint sovereigns. *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765 (2002). Principles of federalism are placed in jeopardy if a State's efforts to create and establish a state agency can be undercut by a civil litigant who fails to come forward with concrete evidence that the statements of a state legislature cannot be trusted. The claims that Oberg has brought against VSAC can and should come to a close. The District Court's grant of summary judgment in favor of VSAC should be affirmed.

## CONCLUSION

The Court should affirm the judgment below.

Respectfully submitted,

s/ Paul D. Clement

JOHN S. WEST
MEGAN C. RAHMAN
TROUTMAN SANDERS LLP
1001 Haxall Point
PO Box 1122
Richmond, VA 23218
(804) 697-1269
john.west@troutmansanders.com

CHRISTOPHER G. BROWNING, JR.
TROUTMAN SANDERS LLP
P.O. Drawer 1389
Raleigh, NC 27602

*Counsel for Appellee Vermont Student Assistance Corporation*

PAUL D. CLEMENT
GEORGE W. HICKS, JR.
RAYMOND P. TOLENTINO
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

JOSEPH P. ESPOSITO
JILL M. DEGRAFFENREID
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037
(202) 955-1500

DANIEL B. HUYETT
NEIL C. SCHUR
STEVENS & LEE P.C.
111 North 6th Street
PO Box 679
Reading, PA 19603
(610) 478-2219

*Counsel for Appellee Pennsylvania Higher Education Assistance Agency*

March 23, 2015

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,744 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

March 23, 2015

s/ George W. Hicks, Jr.
George W. Hicks, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2015, I electronically filed the foregoing Brief with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

s/ Paul D. Clement

Paul D. Clement